**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **BILL E. YOUNG** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **Case No. 7:26-cv-00125** |
| | § | |
| **ANCHOR POWER SERVICES, INC.** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORIGINAL PETITION**

NOW COMES Plaintiff BILL E. YOUNG, complaining of Defendant ANCHOR POWER SERVICES, INC., and for cause of action would show the Court the following:

**Discovery Control Plan**

As provided in Rule 190, Texas Rules of Civil Procedure, Plaintiff intends to conduct discovery under Level 2.

**Plaintiff**

Plaintiff, BILL E. YOUNG, is an individual whose address is 22440 Hog Eye Rd., Manor, Texas 78653. The last three digits of Plaintiff's driver's license number are **281**. The last three digits of Plaintiff's Social Security number are **082**.

**Defendant**

Defendant, ANCHOR POWER SERVICES, INC., is an incorporated entity organized under the laws of the State of Texas and located in Potter County. Defendant may be served by personal delivery at the Principal Office located at 8950 S. Soncy Road, Suite 300, Amarillo, Texas 79119. CEO Kenneth Paul is the Sole Principal, Owner, and Registered Agent on file for ANCHOR POWER SERVICES, INC.

## Venue

Venue is proper in that the events giving rise to this cause of action occurred in Big Spring, Texas, where Plaintiff was working for ANCHOR POWER SERVICES, INC., which is a part of the United States District Court for the Western District of Texas Midland/Odessa Division.

## Jurisdiction

The damages sought in this suit are within the jurisdictional limits of the Court. As required by Rule 47, Texas Rules of Civil Procedure, Plaintiff states that Plaintiff seeks monetary relief over $1,000,000, non-monetary relief, and a demand for judgment for all the other relief to which the party deems entitled.

## Notice of Claim

Plaintiff delivered written notice of this claim to ANCHOR POWER SERVICES, INC., upon issue of citation, after filing petition on April 5, 2026, advising ANCHOR POWER SERVICES, INC., in reasonable detail of the specific complaint made the subject of this action and the amount and nature of the damages and expenses sought.

## Facts

1. On December 21, 2023, BILL E. YOUNG was hired as a Subcontractor and signed an Independent Contractor Services Agreement (ICSA) with ANCHOR POWER SERVICES, INC., a Texas Corporation.

2. Executive Manager Grace Frenzel signed the contract on the same day as the actual and apparent authority for ANCHOR POWER SERVICES, INC. (*see Exhibit A*)

3. The signed ICSA was the Master Agreement for Goods and/or Services (MSA) between the Contracting Party and Tucson Electric Power (TEP), Oncor Electric Delivery Company, LLC (Oncor), Tri-State Generation and Transmission Association, Inc. (Tri-State), and potential other customers.

4. The MSA recited BILL E. YOUNG's responsibilities in completing field observations and inspection in the State of Arizona for TEP; the State of Texas for Oncor; and the States of Nebraska, Colorado, Wyoming, and New Mexico for Tri-State.

5. On March 28, 2025, there was a shift in management within the company, and BILL E. YOUNG was forced to sign a second Independent Contractor Services Agreement (ICSA) with ANCHOR POWER SERVICES, INC. (*see Exhibit B*)

6. ANCHOR POWER SERVICES, INC., refused to pay BILL E. YOUNG for services rendered until the second contract was signed and initialed on each page.

7. BILL E. YOUNG did not agree to the changes within the second contract and attempted to discuss such with management, but ANCHOR POWER SERVICES, INC., would not allow Plaintiff to question or contest the new contract and refused to negotiate any of its terms. Defendant only offered Plaintiff the ultimatum of nonpayment for services rendered and termination. Note that the second contract was never submitted to BILL E. YOUNG in hard copy with signatures.

8. BILL E. YOUNG did not want to lose his job or money owed from work he had already completed, so Plaintiff was compelled to sign the second contract under duress due to Defendant's coercion, threats, and economic pressure.

9. The main changes in the second contract and with management that BILL E. YOUNG did not agree with and ultimately impacted by:

a. the inclusion of a Non-Compete Clause – 2nd contract (6.1);

b. the inclusion of the Termination without Cause – 2nd contract (7.2);

c. the requirement of wearing a black and blue colored vest with insignia and a hard hat, although the vest and hat were the wrong colors and not required by the Texas Department of Transportation – verbal, management;

d. the submission of timesheets and invoices to a third-party subcontractor versus directly to ANCHOR POWER SERVICES, INC. – verbal, management;

e. the requirement of 50 hours of mandatory training without pay that did not adhere to the industry standards of Oncor and OSHA – 2nd contract (Part B, last paragraph);

f. ANCHOR POWER SERVICES, INC., refused to accept BILL E. YOUNG's OSHA lifetime certificate(s) in training and all of the training required as a certified member of the IBEW Union in lieu of the required 50 hours of mandatory training without pay – verbal, management (*see Exhibits C, 1-6*); and

g. a change in Contractor Pay Rates – straight time rate with no percentages and Oncor's rate was no longer listed – 2nd contract (Part D).

10. Per the second contract, the Lead Contractors, specifically Tom Kruser, Jacob Thornton, and Ronnie Blain, were the "voice" for the main office (Justin Campbell and Matt Mahoney) and were knowingly and independently billing Oncor Electric while employees were at the jobsite and completing the mandatory online training for ANCHOR POWER SERVICES, INC.

11. Note that the mandatory online training is not OSHA or Oncor compliant per the standard 1910.26 in the *Oncor's Safety Manual*.

12. These same employees were not only billing Oncor Electric for the hours supposedly worked while completing the mandatory online training, but ANCHOR POWER SERVICES, INC., was also taking 30% to 35% cut in the submitted hours.

13. On August 12, 2025, at 4:40:19 p.m., Defendant emailed BILL E. YOUNG a Termination Letter. (*see Exhibit D*) Plaintiff did not accept the email and requested Defendant send the letter as per the contract and also under legal conditions.

14. BILL E. YOUNG received a Termination Letter via FedEx several days later, and the USPS delivered another copy via post. However, Defendant exceeded the timeframe noted in the Termination Letter of August 12, 2025, in that Plaintiff did not receive the letter until after retaining legal counsel on August 29, 2025.

15. BILL E. YOUNG submitted his final invoice on August 23, 2025, for services rendered on August 11th, 12th, and 20th of 2025 … three days at 15 hours equaling $1,526.00 take-home after a 30% deduction for the IRS Form 1099. Yet, Plaintiff did not receive payment in full until August 29, 2025.

16. Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) in August of 2025 to preserve the claim(s).

17. On October 23, 2025, BILL E. YOUNG, through his attorney, sent the first of two demand letters via certified mail. Defendant did not respond. (*see Exhibits E and F*)

18. On November 25, 2025, BILL E. YOUNG, through his attorney, sent a second demand letter via certified mail. Defendant did not respond. (*see Exhibits G and H*)

19. Plaintiff had an EEOC Intake Interview on December 23, 2025, at 4 p.m. and received a Charge of Discrimination Form 5. (*see Exhibit I*)

20. On January 6, 2026, Plaintiff received an EEOC "right to sue" letter via email with a 90-day deadline of April 6, 2026, to file suit. (*see Exhibit J)*

33. Having provided proper notice with two demand letters and an EEOC Charge of Discrimination, BILL E. YOUNG is seeking relief through the courts.

**Cause of Action(s)**

**Cause I: Breach of Contract**

Employment Contracts outline essential terms such as compensation, job responsibilities, benefits, and termination conditions, creating clarity for everyone involved.

An employment contract is a legally binding agreement between an employee and an employer that outlines the terms and conditions of the working relationship. While Texas operates primarily as an at-will employment state, allowing both employers and employees to terminate the relationship at any time for almost any reason, employment contracts can supersede this standard.

Here, BILL E. YOUNG had a written contract with Defendant on two separate occasions. The first contract was signed on December 21, 2023, and without issue. However, the second contract was signed under duress, coercion, and economic pressure on March 28, 2025. Defendant stated no employee would be paid unless the second contract was signed, even if an employee had already worked the hours as was the case with Plaintiff. Also, there was the possibility of termination if the second contract was not signed. It could be argued that because

BILL E. YOUNG was forced to sign the second contract under duress, the second contract is voidable.

Alternatively, an Employer, such as Defendant, must honor the terms of an employment contract. Failure to do so can constitute a breach of contract under Texas law.

*What Constitutes a Breach of Contract?*

A breach of contract occurs when one party fails to fulfill the terms outlined in a legally binding agreement. In the context of employment contracts, breaches can take many forms, often disadvantaging employees or employers.

Here, BILL E. YOUNG was paid for three days of services rendered but not on the specified schedule set by the company's policy and procedure. BILL E. YOUNG submitted his final invoice on August 23, 2025, for services rendered on August 11th, 12th, and 20th of 2025. Plaintiff should have been issued a paycheck within two business days, but he did not receive payment in full if $1,526.00 until on or about August 29, 2025.

• Working Conditions: Not adhering to agreed job responsibilities or maintaining promised workplace standards. For example, assigning duties far outside the scope of the role described in the contract.

First, BILL E. YOUNG was required to complete mandatory training without pay even though he had already completed such training plus more advanced training and retained a lifetime certificate for such. Note that Defendant was put on notice by Plaintiff for his advance training and certificate(s) before refusing to retake such training.

Second, BILL E. YOUNG was required to wear a black and blue colored vest with insignia, shirt, and hard hat along with the other employees when within 20 feet of a roadway, although the vests and hats were in the wrong color. The TDOT requires green and orange vests and hard hats. Oncor Electric and OSHA do not have such requirements. Note that Defendant was put on notice once again by Plaintiff for distributing the wrong colors and not following the TDOT actual requirements.

• Benefits: Refusing to provide agreed-upon benefits, such as paid time off, retirement contributions, or performance-based or incentive bonuses.

Here, Defendant expected the employees and BILL E. YOUNG to take the mandatory training, and without pay. The training was extensive and over several days, requiring the employees to take away from actual work on the job site.

Also, Defendant promised bonuses to employees and subcontractors for recruiting qualified employees who are retained for employment for both a 6-month period and a one year timeframe. Each target timeframe had a payout agreement. To date, BILL E. YOUNG has not been paid for two (2) such employees.

• Duration of Employment: Terminating an employee prematurely without valid cause or in violation of the contract's specified terms of employment.

Here, BILL E. YOUNG was terminated for not properly submitting his invoices to a contracted third party versus to the company directly as per the initial contract; not wearing the colored vest with insignia and hard hat per the second contract; not completing the mandatory training; and voicing his concerns to Defendant's management for OSHA violations, Oncor Electric billing hours and percentages, and TDOT regulations.

• Non-Compete or Non-Disclosure Clauses: Overstepping contractual obligations after employment, such as using confidential information or enforcing overly restrictive non-compete clauses beyond their intended scope.

Here, the non-compete clause found in Defendant's second contract was overbroad due to the clause covering "every state" in the U.S.; and thus, it is likely the clause would be found unconstitutional and would not be upheld in a court of law, if challenged.

*Understanding Texas Law on Breach of Contract*

Texas adds a unique layer of complexity to breach of contract cases. Employment contracts in Texas must clearly define expectations, responsibilities, and terms to hold up in court:

First, there was no clause or statement in BILL E. YOUNG's employment contract that stated he was required to follow any direction(s) from the Lead Contractors, specifically Tom Kruser, Jacob Thornton, and Ronnie Blain. These individuals had the same identical contract as BILL E. YOUNG and the other employees.

Second, BILL E. YOUNG's contract was between Defendant and his company only. His contract did not state that Plaintiff had to take direction(s) from anyone, and it specifically stated that he was responsible for getting his own work with Oncor Electric.

Finally, BILL E. YOUNG submitted his final invoice on August 23, 2025, for services rendered on August 11th, 12th, and 20th of 2025, and yet, Mr. Young did not receive payment in full until August 29, 2025, as stated above.

It could be argued that the second contract lacked the clarity in its language and record-keeping to protect BILL E. YOUNG's employee rights upon evaluation and termination.

*What Legal Remedies Exist for Breach of Contract in Texas?*

A breach of contract can lead to significant consequences, especially in employment-related disputes. When facing this situation in Texas, the legal remedies available depend on the nature and impact of the breach. These remedies are designed to either compensate for losses, enforce agreements, or restore balance between the parties.

There are several common legal remedies, including:

• Monetary Damages: This is the most typical remedy. It compensates an employee for financial losses caused by the breach (agreed wages, promised benefits, potential bonuses, and additional costs resulting from the breach).

• Specific Performance: When money is not enough to resolve the problem, a court may order the breaching party to perform their contractual duties. For instance, if an employer agrees to provide a specific position or opportunity and fails to deliver, the court could enforce the original agreement.

• Rescission: If the breach has fundamentally damaged the contractual relationship, rescission cancels the agreement altogether (mutual trust destroyed).

• Liquidated Damages: Some contracts include a pre-agreed penalty for breach. If such a clause exists, the breaching party must pay the specified sum (i.e. non-compete clause).

It could be argued that Defendant breached both the first and second written contract due to violations of their own company's policies and procedures regarding payments for services

rendered; requiring employees to complete mandatory, unpaid training; requiring subcontractors and other employees to wear a wrong colored vest with insignia and hard hat that was not even required by Oncor Electric or OSHA; an overbroad non-compete clause in the second contract; requiring Plaintiff to follow direction(s) from individuals who had the same identical contract; and terminating Plaintiff for submitting invoices to the company directly versus through a third party; and voicing concerns to Defendant's management for OSHA violations, Oncor Electric billing hours and percentages, and TDOT regulations. Due to Defendant's breach of contract(s), Plaintiff seeks monetary damages for lost wages, benefits, unpaid bonuses, and future lost wages.

**Cause II: Age Discrimination in Employment Act (ADEA) § 1625.2**

The Age Discrimination in Employment Act of 1967 (ADEA) is codified at 29 U.S.C. 621 and in subsequent sections. Amendments to the ADEA include those introduced by the Older Workers Benefit Protection Act of 1990 and the Civil Rights Act of 1991. The ADEA prohibits employment discrimination against persons 40 years of age or older.

The law forbids discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoffs, training, fringe benefits, and any other term or condition of employment.

Under the *McDonnell Douglas* test, Plaintiff can prove his or her case by showing that he or she is within the protected age group; that he or she was doing satisfactory work; that he or she was discharged despite the adequacy of his or her work; and that the position was filled by employees younger than the age of Plaintiff.

Federal and state laws prohibit employment discrimination in Texas based on the following traits: Race, Color, National origin, Religion, Sex, Gender, Pregnancy, Sexual orientation, Gender identity, Age, Citizenship status, Disability, and Genetic traits.

People who belong to any of these "protected classes" have protection from discrimination. Meaning, an employer cannot take a negative action because of an employee's protected class status.

Here, BILL E. YOUNG's date of birth is April 22, 1959. Plaintiff is 66 years of age and is within a protected class of "age." Defendant subjected Plaintiff to a campaign of adverse employment actions, including:

a. requiring Plaintiff to complete 50 hours of mandatory training without pay that did not adhere to the industry standards (Oncor Electric and OSHA) and then refusing to accept BILL E. YOUNG's lifetime certificates in training and other extensive training as a certified member of the IBEW Union in lieu of the required 50 hours;

b. requiring Plaintiff to follow direction(s) from individuals who had the same identical contract; and

c. terminating Plaintiff for submitting invoices to the company directly as per the initial contract versus through a third party and voicing his concerns to Defendant's management for OSHA violations and TDOT regulations.

After termination, BILL E. YOUNG was replaced by a younger, less experienced male employee. Plaintiff's experience in the power line industry started in 1977 and expands over 49 years. (*see Exhibit K*) It could be argued that these adverse actions were based on age discrimination under the ADEA as evidenced by Plaintiff's replacement.

*Laws Governing Employment Discrimination*

Federal and state laws prohibit various kinds of employment discrimination. Chapter 21 of the Texas Labor Code deals with discrimination based on race, color, disability, religion, sex, national origin, or age.

Age discrimination involves treating someone (an employee) unfavorably because he is of a certain age. Here, BILL E. YOUNG is within four years of retirement. It could be argued that Defendant terminated Plaintiff and limited his subcontracting work due to his age of 66 years.

*Discrimination*

Most employment discrimination laws apply to employers that have at least 15 employees. Here, Defendant has 101+ employees.

Many negative employment actions can form the basis of a discrimination claim. The law targets negative actions with significant, tangible consequences, such as suspensions and termination. Here, Defendant terminated Plaintiff and without proper contract notice for more than two weeks.

**Cause III: Retaliation**

Essentially, there are three parts to a successful retaliation complaint. The complaint must show:

• That the employee engaged in an activity protected under the law.

Here, BILL E. YOUNG reported safety concerns and violations, OSHA and TDOT requirements, misappropriation of billing hours and expense claims. These were protected activities.

• The employer took an adverse action against the employee.

After BILL E. YOUNG reported the safety concerns and violations, the company's upper management adverse actions were: 1) report to employees at the same level and with the same contract; 2) submit invoices through a third party versus directly; 3) termination without proper notice per contract; and 4) delayed payment of unpaid wages for services rendered.

• And there is a causal link between the employee's protected activities and the employer's adverse action.

According to the Fifth Circuit, all a plaintiff must show to establish a prima facie causal link is that the protected activity and the adverse action are "not wholly unrelated." *See Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir. 2001).*

There are two main ways: (1) temporal proximity, (2) knowledge of the protected activity by the person who took the adverse action or recommended the adverse action. *See Teague v. Williamson County, No. 1:18-cv-1098-RP, 2020 WL 2542869, at *13 (W.D. Tex. May 5, 2019).*

Here, the causal link is BILL E. YOUNG reported safety concerns and OSHA violations; TDOT regulations and inconsistencies; and ultimately, Plaintiff was terminated and without proper notice per contract.

*Protected Activity*

As an employee and subcontractor, BILL E. YOUNG was within his rights to report and file claims with OSHA and other governmental agencies regarding the new requirements and conditions of employment that did not align with current TDOT regulations and other governmental agencies.

However, Plaintiff only voiced his concerns to Defendant's management and refused to take the required training for no pay that he already had lifetime certificates of completion for plus more. Plaintiff's actions were protected activities under the law.

*Employer Adverse Action*

If an employer has tried to prevent an employee from taking part in a protected activity, then that employer has retaliated — or taken an adverse action — against an employee. Retaliation can take a number of forms:

- Refusal to hire
- Reduction in hours, including overtime
- Schedule changes
- Reduction in pay
- Denial of promotion
- Demotion
- Unjustified negative evaluations
- Unjustified references
- Increased surveillance of employment
- Threats
- Termination of employment

*Termination of Employment*

The EEOC laws prohibit punishing job applicants or employees for asserting their rights to be free from employment discrimination including retaliation. Defendant might be inclined to argue that BILL E. YOUNG was an Independent Contractor and did not fall under the same guidelines.

*Section 406.122(b) of the TWCA*

A subcontractor and the subcontractor's employees are not employees of the general contractor for purposes of this subtitle if the subcontractor: (1) is operating as an independent

contractor; and (2) has entered into a written agreement with the contractor that evidences a relationship in which the subcontractor assumes the responsibilities of an employer for the performance of work.

Here, the kind of restrictions and requirements placed on Plaintiff during his contract(s) with Defendant, especially the second contract, more closely resembled an employer/employee; relationship, such as: 1) requiring mandatory training without pay; 2) requiring a colored vest with company insignia, shirt, and hard hat at all times; 3) including a non-compete clause in the contract; 4) requiring invoices be submitted through a third party versus directly; 5) refusing to pay for services rendered unless each "employee" signed the second contract; and 6) requiring Plaintiff to defer management questions to other employees at the same level and with the same contract.

**Cause VIII: Violations of Occupational Safety and Health (OSH) Act**

The Occupational Safety and Health (OSH) Act was enacted to "assure safe and healthful working conditions for working men and women." The OSH Act created the Occupational Safety and Health Administration (OSHA) at the federal level and provided that states could run their own safety and health programs as long as those programs were at least as effective as the federal program. Federal and state safety personnel work to ensure worker safety and health through work site enforcement, education and compliance assistance, and cooperative and voluntary programs. Enforcement and administration of the OSH Act in states under federal jurisdiction is handled primarily by OSHA. Safety and health standards related to the power line industry.

To ensure safety and compliance in the power line industry in Texas, OSHA had the following guidelines:

- Conduct regular safety training for all employees on electrical hazards.
- Ensure proper use of personal protective equipment (PPE) such as hard hats and insulated gloves.
- Implement lockout/tagout procedures to prevent accidental energization during maintenance.
- Maintain clear access to power lines and work areas to prevent accidents.
- Regularly inspect tools and equipment for safety compliance and functionality.
- Report and document all incidents and near misses to improve safety protocols.

Here, Defendant's requirement of 50 hours of mandatory training without pay for all employees and subcontractors was not OSHA or Oncor Electric compliant per the industry standard 1910.26 in the *Oncor's Safety Manual.* Plaintiff put Defendant on notice with his refusal to repeat such training and by making them aware of the industry standards.

*29 CFR § 1926.416 – general requirements*

OSHA's baseline clearance distance from overhead power lines is 10 feet for voltages up to 50 kV, a figure that applies to general construction workers under 29 CFR 1926.416. That distance increases with higher voltages, and the specific requirements change depending on whether operating heavy equipment, performing general construction work, or doing specialized electrical line work.

*29 CFR § 1926.1408 Power line safety (up to 350 kV) – equipment operations*

Cranes and other power-operated hoisting equipment get their own, more detailed set of rules under Subpart CC of 29 CFR 1926. The stakes are higher because a boom or load line can swing into a power line in seconds, and the equipment's reach often extends well beyond what the operator can visually assess.

*Texas Department of Transportation (TDOT)*

To understand TDOT power line regulations in Texas, consider the following points:

- TDOT oversees the safety and maintenance of power lines along state highways.
- Utility companies must adhere to TDOT guidelines for power line placement and clearance.
- Regular inspections are required to ensure compliance with safety standards.
- TDOT coordinates with utility companies for construction and maintenance projects.
- Public safety is prioritized, with clearances established to protect motorists and pedestrians.

Here, BILL E. YOUNG was required to wear a colored vest with insignia, shirt, and hard hat along with the other employees, although the vests and hats were in the wrong color and not required by the TDOT. Plaintiff put Defendant on notice for distributing the wrong colors and what the actual requirements are by the TDOT.

It could be argued that Defendant violated OSHA by imposing a mandatory training without pay and by altering safety protocols as regulated by the TDOT. BILL E. YOUNG refused to follow altering safety protocols not regulated by the TDOT and to take mandatory training that did not meet OSHA, Oncor Electric, or industry standards. Plaintiff's 49 years of experience in the power line industry contributed to his termination, but Defendant's violations of the OSH Act put other younger, less experienced employees safety at risk while Plaintiff still worked there.

**In Conclusion**

ANCHOR POWER SERVICES, INC., committed a Breach of Contract on both contracts, assuming the second contract is not voidable due to Plaintiff's duress at the time of signing; violations under Title VII, the ADEA, 42 U.S.C. § 1983 – Fourteenth Amendment, violations of the Occupational Safety and Health (OSH) Act, violations of the Texas Department of Transportation (TDOT), and wrongful termination due to discrimination and retaliation under the Equal Employment Opportunity Commission (EEOC) and Texas Worker's Commission (TWC).

As a result of Defendant, Plaintiff has been damaged, for which Plaintiff requests judgment.

**Declaratory Relief**

As provided by 28 U.S.C. §2201, Rules 38 and 39, Plaintiff requests the Court to render a declaratory judgment declaring the "non-compete clause" in ANCHOR POWER SERVICES, INC.'s second contract unenforceable due to the clause covering "every state" in the U.S.; and thus, it is overbroad and unconstitutional and limits BILL E. YOUNG's ability to work as a subcontractor in the power line industry with over 49 years of experience.

The Texas Free Enterprise and Antitrust Act of 1983 states that "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful." However, the Texas legislature has carved out an exception but is inapplicable here.

### Specific Performance

Monetary damages are an inadequate remedy alone for the injuries suffered by Plaintiff as a result of Defendant's violations and termination. Plaintiff would have retired in four years at 70 years of age had he continued working with ANCHOR POWER SERVICES, INC. Upon termination, Plaintiff had an opportunity to work with Oncor Electric directly, but Defendant used the "non-compete clause" to stop the hiring process.

If the second contract is valid versus voidable and the Court chooses to decline a declaratory judgment, alternatively, Plaintiff seeks removal of the "non-compete clause" so as to have the option to work with Oncor Electric and other similar companies as a subcontractor with 49 years of experience in the power line industry.

### Exemplary Damages

The conduct of Defendant as described above constituted intent, fraud, and malice.

Plaintiff seeks exemplary damages as provided in Section 41.003, Texas Civil Practice and Remedies Code, for which Plaintiff requests judgment.

### Liquidated Damages

If applicable, the plaintiff requests an award of liquidated damages, for which Plaintiff requests judgment.

### Noneconomic Damages

As a result of Defendant' conduct, Plaintiff suffered noneconomic damages as defined in Section 41.001, Texas Civil Practice and Remedies Code, for which Plaintiff requests judgment.

### Economic Damages

As a result of Defendant' conduct, Plaintiff suffered economic damages as defined in Section 41.001, Texas Civil Practice and Remedies Code, for which Plaintiff requests judgment.

### Attorney's Fees and Costs

Plaintiff requests judgment for reasonable attorney's fees and costs under Sections 37.009 and Chapter 38, Texas Civil Practice and Remedies Code.

## Alternative Pleadings

As provided in Rule 48, Texas Rules of Civil Procedure, claims for relief made in this petition are presented in the alternative when necessary to preserve such claim.

## Required Initial Disclosures

As provided in Rule 194, Texas Rules of Civil Procedure, required Initial Disclosures of all items listed in Rule 194.2 must be made at or within 30 days after the filing of the first answer unless a different time is set by the parties' agreement or court order.

Plaintiff asks the Court to keep the requirement of Initial Disclosures to be made within 30 days.

## Prayer

Plaintiff prays that citation be issued commanding Defendant to appear and answer herein and that Plaintiff be awarded judgment against Defendant for the relief requested herein and for all other relief to which Plaintiff is entitled both in equity and at law.

Respectfully submitted,

*The Law Office of Marvilyn E. Blair, PLLC*
P.O. Box 1373
Andrews, TX 79714

***/s/ Marvilyn E. Blair***
Marvilyn E. Blair
*Attorney for BILL E. YOUNG*
Bar No: 24120458
Office Phone: (432) 202-8371
Cell Phone: (919) 928-2813
Email: marvilyn.blair@gmail.com